| | |
|---|---|
| HANWHA AZDEL, INC., | CIVIL ACTION NO. 6:12-CV-00023 |
| *Plaintiff,* | |
| v. | **MEMORANDUM OPINION** |
| C&D ZODIAC, INC, | |
| *Defendant.* | NORMAN K. MOON |
| | UNITED STATES DISTRICT JUDGE |

Among other things, Plaintiff claims that Defendant breached a contractual obligation to maintain confidentiality regarding the development of a thermoformable composite sheet product that was to be manufactured by Plaintiff and then formed by Defendant into sidewalls for installation in aircraft cabin interiors. Plaintiff alleges that Defendant provided a third-party, Crane & Co. ("Crane"), with confidential information related to Plaintiff's product and wrongfully placed Crane in Plaintiff's intended role as Defendant's supplier of raw material for aircraft sidewalls. In Plaintiff's view, Crane used the confidential information to develop a product that has shown great promise and is expected to generate substantial profits for Defendant. Plaintiff seeks disgorgement of Defendant's profits and other damages.

The matter is before me upon consideration of Defendant's motion for summary judgment and Plaintiff's motion for partial summary judgment. My review of the record discloses the following: Plaintiff never manufactured a usable product; the undisputed material facts present matters of contract interpretation that I must decide in Defendant's favor; and Plaintiff has not produced any evidence that Defendant breached any obligation of confidentiality to Plaintiff in connection with Defendant's more recent contractual relations with Crane. Accordingly, Defendant's motion will

be granted, and Plaintiff's motion will be denied.

## I. THE COMPLAINT

According to Plaintiff, over several years Plaintiff developed a thermoplastic composite sheet product, "Aero-lite™ " ("Aero-lite"), with an intended end-use application as an interior liner for airplane cabins. Given Defendant's expertise in the end-use application, Plaintiff began working with Defendant to further develop Aero-lite for that purpose. In March 2008, Plaintiff and Defendant negotiated and executed a Memorandum of Understanding ("MOU"), which established the terms and conditions upon which Defendant would purchase Aero-lite from Plaintiff. The MOU included the parties' agreement to collaborate on the design and development of Aero-lite.

Plaintiff's original complaint presented a straightforward breach of contract case: two causes of action alleging that Defendant failed to pay Plaintiff for sheets of Aero-lite delivered pursuant to the MOU. Defendant answered, asserting that it did not pay for the Aero-lite sheets referred to in Count I of the complaint because those Aero-lite sheets were delivered in a warped condition and produced warped, brittle aircraft interior sidewall panels that (i) failed to conform to Defendant's "Specification" and the terms of the purchase orders, (ii) could not be used to form aircraft sidewalls, and (iii) were rejected by Defendant's customer, American Airlines. Regarding Count II, the answer asserted that Defendant did not pay for 8 (out of 20 ordered) sample sheets of lighter weight Aero-lite because Plaintiff could not reliably produce the lighter weight sheets, which were also non-conforming and unusable for aircraft sidewalls.

Thereafter, Plaintiff was granted leave to amend the complaint to include two additional claims, Counts IV and V, based upon the allegation that Defendant had breached confidentiality provisions contained in a separate Mutual Confidentiality and Non-Disclosure Agreement ("NDA") by wrongfully disclosing to a third-party – Crane, as previously mentioned – Plaintiff's confidential

information.[1]  Plaintiff alleged that Defendant's disclosures regarding the manufacturing problems with Aero-lite allowed Crane to successfully develop Composite Aerospace Board (or "CAB"), a viable thermoformable plastic sheet material that, unlike Aero-lite, could be used to form acceptable aircraft sidewalls.  Plaintiff sought damages and injunctive relief.

After that amendment, Plaintiff supplemented its original discovery requests with 4 new interrogatories and 50 new document requests focused primarily on the two new claims.  Defendant's responses to this second round of document requests produced over 600 pages of paper documents and more than 15,000 pages of electronic discovery.  Thereafter, Plaintiff was granted a second motion for leave to amend the complaint.  The amendments included 5 new forms of relief under Counts IV and V:  lost profits, restitution, disgorgement, an accounting or constructive trust of proceeds of sale of CAB, and a request for an "Order that the MOU and NDA have been and are lawfully canceled by Azdel, and AZDEL is released from all obligations thereunder."  The amendments also added language identifying the Specification attached as Exhibit B to the MOU, CDM005-05, as Plaintiff's confidential information, which Defendant allegedly wrongfully disclosed to Crane.  Thus, the wrongful disclosure claims became focused upon disclosures to Crane of information about the problems with Aero-lite, plus Defendant's Specification, which Defendant contends is proprietary to it.[2]

Thereafter, the damages portion of Counts IV and V were bifurcated from the liability issues.

---

[1] Plaintiff also added a new MOU-based claim, as Count II of the amended complaint, seeking as an alternative measure of damages the raw materials, work in process, and finished goods on hand at the time of termination of the contract.

[2] There is no prohibition in either the NDA or the MOU against disclosure of Defendant's own proprietary Specification, a document that is not proprietary to Plaintiff and, in any case, was not marked confidential by Plaintiff.  A complete version of the MOU and all attachments thereto, including the NDA and Defendant's Specification, has been filed under seal.

To recapitulate the complaint, as presently amended, Counts I through III seek compensatory damages for Defendant's alleged failure to pay for the Aero-lite product Plaintiff manufactured pursuant to purchase orders issued by Defendant. Counts IV and V pursue additional damages and injunctive relief arising from Defendant's alleged breach of purported contractual confidentiality and non-disclosure obligations – specifically, Defendant's alleged wrongful disclosure of confidential information to an unauthorized third party, Crane, Plaintiff's supposed competitor, in connection with Crane's development, manufacture, sale, and use of CAB, a competing product that Defendant has purchased and incorporated into its products in place of Aero-lite.

## II. CROSS-MOTIONS FOR SUMMARY JUDGMENT

### A.

Federal Rule of Civil Procedure 56(a) provides that a court should grant summary judgment (or partial summary judgment) "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In order to preclude summary judgment, the dispute about a material fact must be "'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also JKC Holding Co. v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). However, if the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250. In considering a motion for summary judgment under Rule 56, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *Shaw v. Stroud*,

13 F.3d 791, 798 (4th Cir. 1994).

When faced with cross-motions for summary judgment, the standard is the same. The court must consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar,* 316 F.3d 516, 523 (4th Cir. 2003) (quotations omitted). If the court finds that there is a genuine issue of material fact, both motions must be denied. "But if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." *Trigo v. Travelers Commercial Ins. Co.*, 755 F. Supp. 2d 749, 752 (W.D. Va. 2010).

*B.*

The material facts in this case, as derived from the record and aired at the hearing on the instant motions, and regarding which there are no genuine disputes, are as follows:

- Plaintiff contracted with Defendant to produce sheets made of 2,000 grams-per-square-meter ("gsm") Aero-lite material to be molded by Defendant into aircraft sidewalls for American Airlines' B757 refurbishment program.

- Plaintiff warranted to Defendant that the material would meet the performance Specification, CDM005-05, which had been previously drafted by Defendant and which was attached to the MOU.

- The Specification expressly disavowed any interest in the vendor's proprietary and intellectual information and contained no description of Plaintiff's method of production of Aero-lite, only the performance criteria that the Aero-lite sheets and molded sidewall would have to achieve.

- Plaintiff agreed that Defendant would have the right to terminate and cancel open purchase orders if Plaintiff breached the terms of the MOU; if the material did not perform as predicted and was not suitable for Defendant's intended use; and/or Defendant's customer rejected the Aero-lite sidewalls in favor of conventional sidewalls.

- Although Defendant's purchase order for the material called for delivery of 40 pre-production Aero-lite sheets in June of 2008, Plaintiff manufactured or partially manufactured 2,393 sheets even before Plaintiff knew whether the pre-production sheets were suitable for use as sidewalls by Defendant and

would be accepted by American Airlines.

- The Aero-lite sheets initially delivered to Defendant were warped, brittle, and suffered from other defects, and Defendant promptly advised Plaintiff in writing that they definitely could not be used for American Airline's sidewalls as intended.

- A second order for a lot of 20 sheets of lighter weight 1,320 gsm Aero-lite material was not completely fulfilled by Plaintiff even after Defendant gave Plaintiff an opportunity to cure its partial delivery.

- Defendant was not restricted under its agreement with Plaintiff from working with any alternative supplier of thermoformable plastic sheet material; it did not give Plaintiff any guaranty of exclusivity.

- Plaintiff has not shown that Defendant provided any of Plaintiff's confidential information – whether labeled confidential or otherwise – to another supplier of thermoformable plastic sheet material after Plaintiff failed to produce a viable product that Defendant could commercialize.

- Plaintiff has not shown (and has not attempted to show) any lost profits that resulted from Defendant's alleged disclosures of information to Crane, a non-party to this lawsuit.

Plaintiff attempts to create the appearance of material factual disputes by mis-characterizing testimony, building inferences upon each other, or drawing unwarranted conclusions from isolated excerpts of testimony, devoting 17 pages of its opposition to Defendant's motion to the recitation of allegedly disputed facts. However, given the applicable summary judgment standard, and to the extent Plaintiff correctly acknowledges the record evidence, these alleged factual disputes lie on the periphery of the case and do not create any "genuine" dispute with respect to any "material" fact. It is well-established that the mere existence of "*some*" factual disputes will not defeat summary judgment; the dispute must be "genuine" and concern "material" facts. *Anderson*, 477 U.S. at 247-248 (emphasis in original); *see also Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). Only legitimate disputes over facts that might affect the outcome of the suit under the governing law fall within that category. *Id.*; *see also Fields v. Verizon Servs. Corp.*, 493 Fed. App'x 371, 374 (4th

Cir. 2012).

Abstract or conjectural doubts, minor discrepancies, and points irrelevant to the "material" facts, such as those raised by Plaintiff (and thoroughly discussed in the pages that follow), are not genuine or material and do not cast sufficient doubt on the validity of testimony to preclude the entry of summary judgment. *Emmett*, *supra*; *Hux v. City of Newport News, Va.*, 451 F.3d 311, 315 (4th Cir. 2006). The non-movant cannot demonstrate a triable issue of disputed fact by building one inference upon another. *Emmett*, *supra* (citing *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)). Plaintiff's filings – its opposition to Defendant's motion for summary judgment and its own motion for partial summary judgment – seek to create factual disputes, but where factual issues exist, they are not central to the material facts or the legal contract interpretation questions presented for consideration in Defendant's motion. Plaintiff raises numerous issues, but nothing that overcomes the fact that Plaintiff was unable to make and deliver a viable product to Defendant and Defendant was under no restraints – and thus no restraints were violated – when Defendant turned to another vendor.

### III. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

*A.*

Defendant argues that it properly rejected the 144 sheets of 2,000 gsm Aero-lite that Plaintiff delivered. Plaintiff counters that Defendant did not seasonably notify Plaintiff of its rejection, but instead used the material for Defendant's own purposes. In Plaintiff's view, Defendant's actions constitute acceptance of the goods as that terms is defined by the Virginia Commercial Code ("UCC"), § 8.2-606(1)(c), even though Plaintiff cannot point to any receipt or other documentation indicating acceptance. Indeed, as evidenced by a substantial and detailed e-mail dated July 2, 2008, to Christopher Willis, Plaintiff's "Marketing Director, Non-Automotive," from Jim Del Pinto,

"Director, C&D Zodiac, Materials and Process Engineering," Defendant rejected the 2,000 gsm Aero-lite because that product "definitely cannot be used for sidewall production," which undisputedly was Defendant's intended use for the material. Indeed, so central was this intended use to the entire arrangement that the parties agreed in the MOU that the agreement could be terminated if the "material does not perform as predicted and is deemed not suitable for C&D's intended use, conversion, or processing."

Whether acceptance or rejection occurred depends upon the intent of the parties as expressed in their agreements and communications. The UCC rules are gap-fillers that apply only when a matter is not addressed. *See* Va. Code. § 8.1A-302; *Cappo Mgt. V, Inc. v. Britt*, 282 Va. 33, 39 (2011); *Barber v. Vistarms, Inc.*, 272 Va. 319, 329 (2006). Accordingly, the terms of the applicable June 2008 purchase order ("PO"), which incorporates the terms and conditions of the MOU, as well as the communications made after Plaintiff's delivery of the ordered sheets, are determinative.

The PO issued by Defendant, like the forecast on which it is based, states that the first scheduled delivery of 40 sheets was for "PRE-PRODUCTION." The parties understood that pre-production had several components: (i) to allow Defendant to internally approve the production tooling and evaluate the product, which had never before been made in commercial quantities; (ii) to get C&D's customer, American Airlines, to "sign-off" on the molded sidewall; and (iii) to get FAA approval.[3] Regardless of UCC provisions, acceptance of the 2,000 gsm product delivered under the PO would not occur unless and until these "pre-production" steps took place and were satisfied.

---

[3] Plaintiff attempts to recast the facts to limit the pre-production components to Defendant's need to get its own equipment and processing started up, claiming that pre-production had nothing to do with the "fit check" at American. However, that picture is inconsistent with the record, which includes meeting notes that distinguish between "Equipment start-up" and "Pre-production activities."

Plaintiff maintains that, because Defendant's Quality Department did not return the product but instead took physical possession of the 144 sheets and formed some into sidewall panels that were presented to American at an installation "fit check," a legal "acceptance" triggering an obligation to pay for the goods occurred. However, as explained by Dennis Rydo, the quality inspector who issued Defendant's non-conforming reports ("NCRs") rejecting the Aero-lite product, the quality department did not formally accept the sheets when they arrived on June 5, 2008, because they had been advised that the Aero-lite sheets were samples, outside of product requirements. This is entirely consistent with Defendant's assertion that the first 40 sheets were delivered for "pre-production" purposes, and explains why the Aero-lite sheet samples were forwarded to Defendant's forming facility and molded into sidewalls. It was only after molding and a fit check that Defendant could decide whether to accept or reject the sheets.

Defendant went ahead with machine set-up and molding trials, but it notified Plaintiff of the warped condition of the sheets, which prompted Chris Willis, acting as Plaintiff's Project Manager for Aero-lite, to visit Defendant's manufacturing facility in June before the fit check took place. Mr. Willis took photographs of the delivered sheets, which he admitted in his deposition testimony had "visual signs of twist, or curl . . . ." The need for Plaintiff's representative to come to Defendant's facility after being informed of the problem with the product undercuts any argument that Defendant accepted the delivered product.

As for Plaintiff's attempted reliance on paragraph (c) of UCC § 8.2-606, Official Comment 4 to that section states that paragraph (c) falls secondary to other sections dealing with rejection of goods, "which permit the buyer to take certain actions with respect to the goods pursuant to his options and duties imposed by those sections, without effecting an acceptance of the goods." The Virginia Comment states that "Subsection 8.2-606(1)(a) is in accord with *Rosenbaum Hardware Co.*

*v. Paxton Lumber Co.*, 124 Va. 346, 353-55 (1919), in holding that a buyer does not accept goods until he has had a reasonable opportunity to inspect the goods." Section 8.2-513(1), in turn, provides that inspection may be made "at any reasonable place and time and in any reasonable manner," and Section 8.2-513(4) allows for "[a] place or method of inspection *fixed by the parties*." (Emphasis added.) Under the circumstances involved here, where Defendant was not otherwise allowed to fully test any Aero-lite sheets, the type of reasonable inspection agreed upon by the parties included the molding trials that Defendant conducted as well as the fit check to see how the molded sheets would perform upon installation. *Cf. Twin Lakes Mfg., Co. v. Coffey*, 222 Va. 467 (1982) (acceptance not found where defendants purchased a two-part mobile home, inspected the parts, installed it, and moved in).

In sum, when all the material facts are considered, it is clear that the 2,000 gsm Aero-lite was never accepted by Defendant as defined in the UCC. To the contrary, it was rejected in a manner and at a time that was reasonable under all the circumstances.

*B.*

i.

Defendant argues that, after rejecting the 144 delivered sheets of Aero-lite, it properly terminated the 2,000 gsm PO under § 11.C(i) of the MOU, thus relieving Defendant of any liability to pay for the undelivered Aero-lite sheets because the product did "not perform as predicted and is deemed not suitable for C&D's intended use, conversion, or processing; and C&D has given the required 60 days notice." Plaintiff maintains that the material performed as predicted because it met the Specification, which it contends is the "sole performance requirement." While it is undisputed that the MOU requires the product to meet the Specification, that requirement is a floor for production, not a ceiling on performance. There is no plausible reason why the words used in §

-10-

11.C.(i) – "perform as predicted" and "not suitable for C&D's intended use" – would be rendered meaningless by basic conformity to the Specification. Indeed, there is no reading of the plain language of the MOU that would lead to such a conclusion, nor is there any evidence in the record indicating that § 11.C(i) should be limited in scope by the Specification.

Had the parties intended to limit Defendant's right to terminate under Section 11.C.(i) in this matter, they could have said so. Contrary to Plaintiff's argument, the Specification is not the exclusive source of predictions as to how the Aero-lite will perform. Prior to the entry of the MOU, Plaintiff had predicted to Defendant (based upon Plaintiff's testing and investigation of the product during development, as referenced in Section 9 of the MOU) many positive attributes that would enure to Defendant's benefit if it purchased the Aero-lite product and used it in aircraft sidewalls. According to Plaintiff, the product would require less labor to mold, would result in an end-product that would be more durable and easier to maintain, and would have superior sound dampening properties when compared to a sidewall formed using crushcore material. Plaintiff also predicted that it could produce Aero-lite sheets that would result in sidewall panels that were lighter in gsm than the traditional crushcore sidewalls.

These predictions were not all met. The product was difficult to mold; indeed, all 40 of the pre-production sheets were used up to get a "couple" of good sidewalls. The product was not more durable and easier to maintain; rather, it was fragile and brittle, and it cracked during attempted installations. Nor was Plaintiff able to manufacture sufficient quantities of Aero-lite sheets that were as light as needed (or promised).

Whether the Aero-sheets were *suitable* for Defendant's intended use as aircraft interior sidewalls was a determination completely separate and apart from compliance with the Specification. Because of Defendant's inability during the molding process to remove the

"warpage" defect that was manufactured into the 2,000 gsm sheets by Plaintiff, Jay Zoller,

American's Lead Interiors Engineer in charge of the project, expressed concerns that, after

installation, a "residual stress" would be placed on the panel that might adversely effect whether

they would hold up in service. Accordingly, as described in written communications after the initial

fit check, Aero-lite was deemed unsuitable for Defendant's intended use because it "definitely can

not be used for sidewall production." This conclusion alone provides a legitimate basis for

termination under Section 11.C.(i) of the MOU, completely independent of whether the delivered

Aero-lite material met the Specification.[4]

In response to Defendant's argument that the MOU and purchase order were also terminated

because of American's request that Defendant switch back to the conventional crushcore-based

sidewalls, Plaintiff contends that "C&D does not point to any evidence in the record suggesting that

AA ever requested that C&D switch back to conventional material." While it may be true that

Defendant cannot demonstrate that American used those *precise* words, in a writing or elsewhere,

---

[4] In addition to its strained interpretation of this provision, Plaintiff argues that Defendant cannot terminate on this ground because "C&D was the sole cause of those failures," and it cannot rely upon its own alleged shortcomings to relieve itself from its contractual obligations. This claim is not contained in the second amended complaint. Until the filing of its opposition, Plaintiff has never argued that Defendant breached any obligation to Plaintiff related to the forming of the sidewall panels. And, the actual undisputed testimony does not bear out Plaintiff's claims. Defendant was not the source of the warpage in the Aero-lite product. To the contrary, it is undisputed that the warpage existed in every stage of Plaintiff's manufacturing of the product. It is also undisputed that Plaintiff, even with Defendant's assistance, could not figure out any way to remove the warpage when the sheets were molded into aircraft sidewalls. (And, while warpage may not have been the "sole" reason why the 2,000 gsm Aero-lite sidewalls were not used by American for the AA 757 Program, it was one reason, as discussed above.)

   Nor was Defendant the source of brittleness in the aircraft sidewalls. As acknowledged by Mr. Willis at his deposition, brittleness was "a function of the state that the [Aero-lite] material was in" because the "Ultem material, which is a large component to the Aerolite product, is brittle in nature." Finally, while weight was an additional factor that made the 2,000 gsm product unsuitable for use as aircraft sidewalls, that weight (which Defendant believed at the time would result in a panel lighter than the benchmark 2400 gsm product) addressed concerns about the product's lack of stiffness, a characteristic inherent in the Aero-lite sheets. In any event, as noted by American, weight was only one factor evaluated by the carrier in determining whether a product was suitable for its use; ease of maintenance, aesthetics, flammability, strength, and reliability of the product were also considered.

there is nothing suggesting that the airline's request must be in that precise form, particularly where, as here, there is more than ample evidence (direct and circumstantial) to prove that a "switchback" to crushcore was requested because, as a practical matter, it was the only option available to American until a viable lighter Aero-lite product could be developed and accepted by the airline customer.[5]

After the fit check, American sent Defendant an e-mail identifying the problems encountered during the fit check and made it clear that it would not consider using Aero-lite unless Defendant provided an action plan to address those problems.[6] Given that the action items included the weight of the product, it was obvious that the warped 2,000 gsm product could not be used, and Defendant had no choice but to switch back to crushcore until a viable and lighter-weight Aero-lite product could be developed, tested, and approved by American. Furthermore, the 2000 gsm Aero-lite is the only material identified in the MOU for use in American's 757 refurbishment program, it is the product Defendant ordered from Plaintiff in March of 2008 for use in that program, and it is the product that was used to form the sidewall used in the AA fit check. Accordingly, American's

---

[5] Plaintiff describes Defendant's evidence of American's request for a "switchback" to crushcore as "hearsay." The undisputed deposition testimony offered by Mr. Zoller and Mr. Kwok in this proceeding is not hearsay, but is precisely the type of discovery evidence that is regularly used by federal courts to decide a summary judgment motion. *See* Fed. Rule of Civ. Pro. 56(c)(1)(A); *Adardour v. Am. Settlements, Inc.*, Civil Action No. 1:08cv798, 2009 WL 2242635 (E.D. Va. July 24, 2009). Furthermore, the cited written documents in support of that testimony, produced around the time of the fit check, contain facts so closely associated with the fact ultimately to be proven – the request for a switchback – as to be admissible and probative circumstantial evidence of what happened five years ago. *See, e.g., Ryan v Maryland Cas. Co.*, 173 Va. 57, 62 (1939); *Dansey v. Metro. Life Ins. Co.*, Civil Action No. 3:11-cv-00013, 2012 WL 4747249 *5-*6 (W.D. Va. 2012); *Marlow v. Chesterfield County Sch. Bd.*, 749 F. Supp. 2d 417, 437 (E.D. Va. 2010). Consequently, to the extent that the statements could be considered hearsay, they are admitted pursuant to Federal Rule of Evidence 807, the residual exception to the hearsay rule.

[6] Plaintiff contends that 10 of the 11 problems identified by American were the responsibility of Defendant, many unrelated to the material itself. However, Section 11.C.(ii) provides for termination if American asks Defendant to switch back to conventional materials, without any consideration of the reasons for the request. Thus, the source of the problems contributing to the carrier's decision is simply not relevant.

rejection of this particular weight Aero-lite, not of Aerolite generally, is all that is necessary to evidence a request to switch back to crushcore.

Plaintiff accurately points out that American "took direction" from Defendant regarding the products to be used in its refurbishment project. However, Plaintiff ignores other material factual testimony confirming that American makes the "ultimate" decision as to what product goes on its aircraft. Indeed, if American did not accept Defendant's crushcore sidewalls, Defendant would have been unable to sell any sidewalls to the carrier. Plaintiff was able to produce an unsigned post-fit check change request from Defendant to allow the use of Aero-lite based sidewalls, but because of American's concerns about Aero-lite, it ultimately did not sign Defendant's request to allow Aero-lite to be used on its aircraft. Accordingly, Defendant had to switch back to the originally proposed crushcore-based sidewall panels, the availability of which American insisted upon from the start, in case Aero-lite did not live up to American's expectations.

These facts establish a contractual basis for termination of the open Aero-lite order under Section 11.C(ii) of the MOU.

ii.

Plaintiff contends that Defendant did not provide adequate notice of termination under the MOU because Mr. Del Pinto's e-mail of July 2, 2008, does not manifest a clear intent to terminate. As a preliminary matter, there is no requirement in the MOU that Defendant give Plaintiff notice of termination pursuant to Section 11.C.(ii) (the switchback termination provision). This is in striking contrast to 11.C.(i) (failure to perform as predicted termination provision) which has a 60-day written notice requirement. Even Subsection (i), however, does not require the notice to use the word "termination" or take any other particular form.

Significantly, Plaintiff does not apply the correct law to the facts in challenging the adequacy

of Defendant's notice. Under the Virginia UCC, "[a] person 'notifies' or 'gives' a notice or notification to another person by taking such steps as may be reasonably required to inform the other person in ordinary course, whether or not the other person actually comes to know of it." *See* Va. Code § 8.1A-202(d). None of the cases cited by Plaintiff address the Virginia standard. Plaintiff cites *Altmayer-Pizzorno v. L-Soft Intern, Inc.*, 302 Fed. App'x 148 (4th Cir. 2008), which is an appeal from a decision by the United States District Court for the District of Maryland, and applies Maryland law. Plaintiff cites *Rosenbloom v Feiler*, 290 Md. 598 (1981), which not only applies Maryland law, but does so in the context of determining whether a writing is sufficient to establish an *anticipatory repudiation* of a contract. Plaintiff cites *Accu-Weather, Inc. v. Prospect Commun., Inc.*, 435 Pa. Super. 93 (1994), which applies Pennsylvania law. But these cases are inapplicable here. They cannot override Virginia law as set forth in its Commercial Code, which requires only a determination whether Defendant's actions "reasonably" informed Plaintiff of its intent to terminate because the Aero-lite sheets did not perform as predicted and were unsuitable for Defendant's intended use as aircraft sidewalls.

Mr. Del Pinto's e-mail of July 2, 2008, stated that, based upon the performance problems displayed by the sidewall panel molded from the 2,000 gsm Aerolite, the sheets "definitely cannot be used for sidewall production."[7] This satisfies Virginia's notice standard. Indeed, Defendant's intent was clearly understood by Mr. Willis who, when asked about the status of the October delivery by Plaintiff's production scheduling group, informed the group, "No. C&D is not

---

[7] Plaintiff mentions in a footnote that this statement is contradicted by evidence that Defendant later molded sidewall panels from the same material for Continental. However, what Plaintiff fails to mention is that this was a smaller insert panel in a frame, making dimensional stability less critical.

committed to taking anyone [sic] 2000 gsm at this time.  All of this product should be put on hold."[8]

Plaintiff largely ignores Defendant's summary judgment argument  that, even were I to find that the e-mail of July 2, 2008, did not provide Plaintiff with legally sufficient notice of termination, the purchase order of September 17, 2008, zeroing out all remaining deliveries certainly did so.  The PO not only inserts a "0.00" as the amount due in connection with each delivery, but adds "*** THIS LINE HAS BEEN REVISED ***" before each listed line item, and in connection with all deliveries other than those already delivered, states "CANCEL ORDER PER DANNY M. . . ."  The "CANCEL ORDER" language cannot be read to signify anything other than Defendant's termination of the order.  Plaintiff's claim (lodged in footnotes) that this later PO was only a place holder while Defendant figured out what it intended to do with the material must be rejected, given the clear cancellation language on the face of the PO.[9]

---

[8] That Mr. Del Pinto also laid out a "moving forward" plan regarding development of a lighter product does not bear upon the effectiveness of the termination of the PO for 2,000 gsm Aero-lite.  Rather, it addresses the plan to develop a "next generation" Aero-lite product, as addressed by Section 4.2 of the MOU.  Likewise, that Mr. Del Pinto indicated that Defendant would look for other possible uses for the delivered material only suggests that Defendant would try to help Plaintiff dispose of the product as agreed in Section 11.D of the MOU.  It does not mean that the MOU or the PO were not being terminated, because the evidence shows that Defendant clearly did not want the sheets unless a viable alternative use was found.

In Defendant's view, should I find that it properly terminated the MOU and the open order for 2,000 gsm Aero-lite, it is entitled to summary judgment on Plaintiff's Count II because § 11.D was intended to allow Plaintiff relief only if Defendant terminates without cause.  Plaintiff argues in passing that Defendant effectively allows that § 11.D is ambiguous, and is asking me to consider the parties' intent.  However, this provision is really susceptible to only one interpretation when viewed in the context of the termination provision (§ 11) as a whole:  the alternative measure of relief is available only if Defendant were to terminate the MOU entirely without cause and for reasons within Defendant's own control.  Thus, the alternative measure of relief is not available.

[9] At the very least, the revised purchase order cancelled all deliveries of Aero-lite sheets due more than 60 days after its issuance, which is the stated notice period for termination under Section 11.C.(i) when a product fails to perform as predicted.  This would include the December 2008 through February 2009 deliveries totaling 1,650 sheets.  Even if Plaintiff were entitled to payment for some portion of the undelivered sheets (even though they were warped), Defendant would not be liable for the cost of the final 1,650 sheets.

*C.*

Regarding Count III of the complaint, in which Plaintiff seeks to recover the $6,000 billed to Defendant for the 8 sheets of 1,320gsm Aero-lite delivered to Defendant in August 2009, Defendant contends that it has no obligation to pay for this partial delivery of 8 out of 20 ordered sheets because the purchase order for the 1,320 gsm Aero-lite sheets was based upon a single $15,000 price for the entire lot, and Plaintiff was not able or willing to complete the order. Defendant argues that Virginia follows the majority rule that a party that renders less than "substantial performance" has no right to the contract price. *J. David Conti, Inc. v. Stokes Equipment Co., Inc.*, 73 F.3d 357 (Table), 1995 WL 764529 at *4 (4th Cir. Dec. 22 1995); *American Chlorophyll, Inc. v. Schertz*, 176 Va. 362, 372 (1940). Plaintiff argues that, under Virginia's UCC, the perfect tender rule applies, not the substantial performance rule. This does not help Plaintiff at all, as the delivery of 8 out of 20 ordered sheets is not a perfect tender. *See* Va. Code § 8.2-601 (buyer has option to reject whole where goods fail to conform to contract). In Plaintiff's view, under UCC § 8.2-606(2), Defendant's acceptance of 8 sheets constitutes acceptance of the entire order. But it is simply beyond reason to find that Defendant accepted the entire order of 20 sheets when Plaintiff did not even deliver 12 of the 20 ordered sheets and where the "whole commercial unit" involved was the *entire* 20 sheets. *See* Official Comment to 8.2-606(2) at PURPOSES AND CHANGES AND NEW MATTER, ¶ 5. As Plaintiff's opposition acknowledges, even if the goods were accepted, Defendant can avoid the obligation to pay by establishing a breach with respect to the goods accepted. Va. Code § 8.2-607(4). Here, Plaintiff clearly breached its obligation to provide Defendant with 20 sheets of the 1,320 gsm Aero-lite material as the parties had agreed, given that Plaintiff delivered only eight sheets and refused to complete the remainder of the order. Thus, Plaintiff is not entitled to the contract price for the eight sheets of the 1320 gsm Aero-lite it delivered.

Plaintiff maintains that the parties moved forward with the 8-sheet delivery because Defendant's Danny Martin advised Plaintiff's Chris Willis that the 8 sheets would be sufficient to mold some sheets and do the testing he needed to accomplish. Even if true, there is no evidence that the purchase order was ever revised to reduce the quantity to 8 sheets. Nor does this conflict with the additional testimony offered by both Martin and Willis that at least 20 would be needed to have enough for qualification and certification if the product was accepted by American. In other words, while the 8 sheets could get Mr. Martin through the first steps (molding and internal tests), it could not get Defendant through all the hoops it needed to jump through to reach the point where the product could be used in American's B757 refurbishment program and, when requested, Plaintiff refused to supply the ordered material that would have allowed that to happen. Accordingly, this is not a factual dispute preventing summary judgment.

*D.*

i.

Plaintiff's opposition contends that "direct evidence definitively establishes that C&D improperly disclosed confidential information to Crane in breach of the MOU and NDA, including the Specification, Azdel's pricing information and Azdel Aero-Lite™ material," which led to a new competitor in the aerospace market and a new competing product. Plaintiff focuses primarily on three of the four types of information discussed by Defendant in its summary judgment brief (Defendant's Specification, Plaintiff's pricing information, and Aero-lite samples) and consigns the fourth (information about the problems with Aero-lite) to a footnote. Plaintiff's arguments, however, are not sufficient to defeat summary judgment. *See SL Montevideo Tech., Inc. v. Eaton Aerospace, LLC*, 491 F3d 350 (8th Cir. 2007).

In the *Eaton Aerospace* case, Eaton contracted with SL Montevideo Technology (SLM) to

provide a brushless direct current motor that met Eaton's specifications, which Eaton would then use in stabilizer trim motors that it had contracted with Boeing to supply for the Boeing 737 aircraft. When SLM proved unable to provide a redesigned model of the involved brushless motor, and because SLM did not have an exclusive supply contract, Eaton sought such a motor from another supplier. SLM then sued Eaton both for breach of the Proprietary Information Agreement (PIA) between SLM and Eaton, as well as for misappropriation of trade secrets. The district court granted Eaton judgment as a matter of law on both claims. SLM appealed only the breach of contract claims. After noting, as here, that the initial design parameters were specified by the buyer (Eaton), the United States Court of Appeals for the Eighth Circuit explained (in words applicable to this case nearly verbatim, with only minor changes):

> Yet SLM asserts the right to bar Eaton from using "the entire design" of a customized product which it designed to Eaton's specifications, with guidance from Eaton and Boeing, and which Eaton purchased outright from SLM. If upheld, this claim would preclude Eaton from obtaining this critical component from another source (including Eaton itself) after *SLM* ended their relationship.
>
> . . .
>
> This is especially true when the alleged breach was committed, not by a free-riding competitor, but by the very customer who defined the product's customized specifications and then purchased the product. Absent misuse of *protected* proprietary information, the PIA did not bar Eaton from using the SLM motors it purchased, from modifying those products, or from seeking a replacement vendor when SLM walked away from their on-going relationship.

*Id.* at 353-354. Like SLM, Plaintiff is attempting to prevent Defendant from obtaining from another source a product similar to the unsuccessful Aero-lite product after Plaintiff effectively walked away from their ongoing relationship. Further, it is attempting to do this without identifying a single document or item provided to Crane that was marked confidential by Plaintiff, and Plaintiff's claim is based upon specifications that were developed primarily by Defendant. *See id.* at 354.

Plaintiff's argument that the Specification is Plaintiff's confidential information relies entirely upon § 12 of the MOU. Indeed, Plaintiff cannot rely upon the NDA, the generally applicable confidentiality agreement, because that agreement would have required Plaintiff to have marked the Specification as confidential to acquire a protected status. The record demonstrates that this is something Plaintiff did not do and could not do, given that the Specification is *Defendant's* proprietary document and, as described by Plaintiff's own deposition witnesses, contains *Defendant's* specifications, not Plaintiff's. Moreover, Plaintiff's reliance upon § 12 of the MOU is totally unwarranted, because the provision states only that "[t]his MOU and any subsequent PO's shall be treated as and kept confidential by both Parties." To state the obvious, it does not mention the Specification. Nevertheless, it is Plaintiff's position that the Specification is covered by this provision because it "was attached to, incorporated within and physically made a part of the MOU" and "executed/initialed/signed with the MOU by the same parties, for the same purpose, and in the course of the same transaction."[10]

The parties agree that the task before me – determining whether Plaintiff can assert confidentiality rights in the Specification – requires construing the words "[t]his MOU" as used in § 12 of the MOU. The parties further agree that these words should be given their "plain meaning." Where the parties differ is whether Plaintiff's reading – which essentially requires that I append the words "and the Specification" or "and the attachments thereto, regardless of provenance" to the

---

[10] Plaintiff suggests that it acquired confidentiality rights in Defendant's Specification under § 12 simply because the Specification, which did not exist prior to the development of Aero-lite, was developed by Defendant in conjunction with some input from Plaintiff in that joint-development effort. The fact that the parties worked together to bring Aero-lite to market, which included drafting the Specification, did not by itself give Plaintiff any rights in the Specification, which was authorized by Defendant. There is no evidence that Plaintiff asked Defendant to mark Defendant's Specification as Plaintiff's confidential information, and Plaintiff has not claimed that it asked Defendant to mark Defendant's Specification as Plaintiff's confidential information.

express term "[t]his MOU" – could be construed as the plain meaning of the "[t]his MOU" provision.

Plaintiff's reading is not a plain or even reasonable interpretation.  The inclusion of both the "MOU" and "subsequent PO's" in § 12 excludes from its scope the Specification and any other documents.  Although the rule of construction applied here – *expressio unius est exclusio alterius*, meaning that the express mention of specific terms in a contract provision excludes all others – should be applied with caution, reading the MOU as a whole requires interpreting the express terms as exclusive (particularly as the MOU does not provide for the inclusion of any other terms or documents as confidential).  *See, e.g.*, *Smith Barney Inc. v. Critical Health Syst. of N.C.*, 212 F.3d 858, 861 (4th Cir. 2000); *Charlotte Union Bus Station, Inc. Internal Revenue*, 209 F.2d 586, 589-590 (4th Cir. 1954); *Bentley Funding Group v. SK&R Group, LLC*, 269 Va. 315, 324, 329 (2005); *Smith v. Pocahontas Fuel Co., Inc.*, 177 Va. 267, 285 (1941).

Indeed, the term is sometimes used in a context where it is clear that the MOU does not include the Specification.  For example, in § 5.1.A, where the MOU is deemed amended if Plaintiff sells Aero-lite to another customer at more favorable prices, the Specification would not be affected by such action.  Additionally, the drafters expressly referred to the Specification elsewhere in the MOU (§§ 9 & 10), but not in § 12, whereupon Plaintiff pins its hopes.  The drafters expressly mentioned both the MOU and the Specification in § 7.A, when both were relevant to the subject matter, but did not do so in § 12.  And, significantly, § 12 defers to the "separate" Mutual Confidentiality and Non-disclosure Agreement ("NDA"), which deals broadly with confidentiality, and supplements the MOU to protect from disclosure the "MOU" and "any subsequent POS" only because they detail the commercial terms of the parties' arrangement, which would not be protected by the NDA; the Specification, by contrast, contains performance requirements for covered products

and would be covered by the NDA if, *but only if*, it were conspicuously labeled as confidential by the disclosing party. If the parties had intended for the Specification to apply exclusively to the Aero-lite product and be confidential to Plaintiff, the material to which the Specification applied could and would have been described in § 2.1 as "Aero-lite." Instead, it was described as "processed materials made with C&D005-01 Type 7 Polyetheriminde (PEI) resin and glass fibers produced in a pulping and sheet process for use with Civil Aircraft," which undeniably covers a broader range of products. As described by Plaintiff's Mr. Willis, it was a "fairly generic specification."

Plaintiff also argues that two papers executed at the same time must be regarded as part of one transaction and be construed as if their provisions were in the same instrument. This is inapposite, because the MOU and Specification were not executed at the same time or even by the same parties. The MOU was executed by Defendant on March 13, 2008, and by Plaintiff on March 18, 2008. The Specification, dated March 9, 2007, was prepared only for three signatures internal to Defendant (prepared by, checked by, and approved by), not Plaintiff's signature, and was unsigned when it was attached to the MOU: the signature blocks were unexecuted. The fact that the parties initialed each page of the four attachments as well as the MOU in March of 2008, including two attachments that did not provide for any signatures, was only an acknowledgment that each page was part of an attachment referenced in the MOU in order to prevent either party from later inserting a modified page. Such initials cannot establish contemporaneous execution of an unsigned document.

ii.

Plaintiff contends that Defendant improperly disclosed "Azdel's pricing information to its competitor." Plaintiff provides excerpts from its written pricing proposals for the 1,320 gsm Aero-lite of which Defendant eventually purchased 20 sample sheets in April of 2009, and claims that the information provided to Crane "correlates *exactly* to Azdel's confidential pricing formula

and is *identical* to Azdel's confidential pricing for 1320 GSM Aero-Lite™." However, Plaintiff has provided isolated excerpts that include matching prices while excluding others that do not match.

Confronted with these deliberate omissions, Plaintiff now argues that the variations are "irrelevant" and that there is "no difference" between providing Crane with Plaintiff's confidential pricing and using the prior pricing information as a guide in letting Crane know what prices Defendant needed. However, as Defendant argues, there is a substantial difference. Businesses looking to sell a product commonly research pricing for competing products in setting their own price. Likewise, businesses looking to purchase a product commonly use pricing for comparable products as a guide in determining what they want to pay and, unless prices are fixed, uses those figures in negotiating pricing with vendors. Plaintiff's argument, which is essentially that its prices cannot be used by Defendant for any purpose, would prevent Defendant from using this common pricing practice and require it instead to determine what it would pay in the absence of any market data. Only Defendant can possibly know what it is willing to pay for a product.

iii.

Plaintiff argues that Defendant disclosed to Crane the "developmental 1320 GSM Aero-Lite™ samples that C&D purchased from Azdel in April 2009," as well as "prototypes formed from those samples." More specifically, Plaintiff states that "C&D permitted Crane to run controlled trials of CAB against Azdel's confidential 1320 GMS Aero-Lite™ material and provided Crane with a prototype of a part that Crane was allowed to form from Azdel's developmental material." As a preliminary matter, I note that Plaintiff itself described the 1,320 sample sheets as "Commercial" in its internal order form for the product. Thus, the claim to confidentiality based upon the samples not having been "commercialized" is contrary to Plaintiff's contemporaneous description of the material.

Moreover, the report cited in support of this allegation does not support Plaintiff's allegations that the 1,320 gsm was disclosed.  To the contrary, the single line of the chart inserted by Plaintiff, when unredacted, shows "1350" gsm Aero-lite being run as a control for CAB, and the photos attached to the cited report (photos that Plaintiff does not mention) identify the Aero-lite control as "1500" gsm.[11]  Mr. Adjei, Crane's Research and Development Manager, who attended the involved CAB trials, testified that he does not recall the specific weight, but understood that the Aero-lite control was a commercial product.  Plaintiff now attempts to address the 1,350 gsm Aero-lite and the 1,320 gsm Aero-lite as one and the same product.  However, the 1,350 gsm Aero-lite referenced in the chart is a different product that was purchased by Defendant from Plaintiff pursuant to Purchase Order 2-1029-3, issued in October of 2008 and, as a result of an April 24, 2009, settlement agreement between the parties pertaining to the lighter weights of Aero-lite (1,250, 1,320, and 1,350 gsm), Defendant agreed to pay (and paid) Plaintiff $30,000 for those sheets.  The 20 sheets of 1,320 gsm Aero-lite, now claimed by Plaintiff to be a developmental confidential product, were ordered by Purchase Order 2-1033-3, dated April 24, 2009, issued as part of the same settlement that resulted in payment for the 1,350 gsm product.  Accordingly, even drawing "all reasonable inferences" from the evidence in Plaintiff's favor, there is nothing in the documentary evidence showing that Defendant provided Crane with the claimed confidential 1,320 gsm product or took any action inconsistent with its duty to Plaintiff under the NDA when it subsequently worked with Crane to develop a sheet product that could be successfully sold to Defendant's customers.

---

[11] As of the filing of Defendant's reply to Plaintiff's response in opposition to Defendant's motion for summary judgment, the 1,500 gsm Aero-lite product referenced in the photo, if that is what was used, was a commercial product still listed on Plaintiff's website.  *See* www.azdel.com/lwrt.htm.

iv.

Plaintiff relegates to a footnote its argument pertaining to the confidentiality of information about the problems with Aero-lite, which was the original basis for the wrongful disclosure claims as set forth in Plaintiff's first amended complaint. Defendant argues that, because it had obtained that information through its own independent work with Aero-lite, it is excluded from the coverage of the NDA by Section 5(d) of that agreement which exempts from its coverage information "developed by the receiving party independently of the Confidential Information of the disclosing Party."

Plaintiff now claims that such information must be confidential because it is derived from the Aero-lite sheets sold to Defendant by Plaintiff.

Although Plaintiff argues that Defendant's interpretation would swallow the confidentiality coverage, it is actually Plaintiff's interpretation that would swallow the exemption by precluding Defendant from making *any* use of *any* information obtained through Defendant's employees' direct involvement in the molding of the raw Aero-lite sheets into aircraft sidewalls, the testing of the sidewalls for internal and FAA approval purposes, as well as its attendance at the fit checks of those sidewalls with American Airlines – all simply because the sidewalls were molded from raw Aero-lite sheets, including the commercial 2000 gsm material. *See SL Montevideo Tech., Inc. v. Eaton Aerospace, LLC*, *supra*. A non-disclosure agreement is only meant to preclude a party's misappropriation of the other party's secret or confidential information; it is not intended to prevent ordinary competition through the use of independently-developed information. *Id.* That is why exemption 5.D, and similar provisions in most non-disclosure agreements, exists. Plaintiff's cramped reading of exemption 5.D would obligate Defendant to lock away every thing it learned while working with Aero-lite in any future endeavors and would effectively render this exemption

meaningless.

*E.*

Defendant argues that, even if it had disclosed confidential information to Crane, it would nonetheless be entitled to summary judgment on the wrongful disclosure claims because Plaintiff has not shown or made any attempt to show that it suffered any injury and damage "caused by" or "as result of" Defendant's alleged breach of its contractual confidentiality obligation, which is an essential element of a breach of contract claim. *See Martin v. NAES Corp.*, Civil Action No. 6:12-cv-00058 (W.D. Va. Feb. 14, 2013), 2013 WL 589485 at *3 (citing *Sunrise Continuing Care, LLC v. Wright*, 277 Va. 148 (2009)); *see also Filak v. George*, 267 Va. 612 (2004); *Tattoo Art, Inc. v. TAT Int'l*, 794 F. Supp. 2d 634 (E.D. Va. 2011) (citing *SunTrust Bank v. Farrar*, 227 Va. 546 (2009)); *Troyk v. Farmers Group, Inc.*, 171 Cal. App. 4th 1305, 1352 (2009); *Gardner v. RSM & A Foreclosure Services, LLC*, 2013 WL 3242211, *3 (E.D. Cal. June 25, 2013); *CDF Firefighters v. Maldonado*, 158 Cal. App. 4th 1226, 1239 (2008). The requisite causation of injury or damages is lacking here because Plaintiff was never able to develop a viable Aero-lite product that Defendant could use in aircraft sidewalls and therefore, could not have incurred lost profits. Indeed, Plaintiff withdrew from the market for Aero-lite in 2010.[12]

Plaintiff claims that it need not prove injury because the NDA provides (at ¶ 11) that a party is entitled to *injunctive relief* in the event of a violation of the agreement. This contractual provision cannot be read to totally eliminate the need to prove causation, an essential element of a breach of

---

[12] Defendant argues persuasively that Benny David, an inventor of Aero-lite who worked with Crane to develop CAB and now works at Crane, had more information than Defendant that could have been passed on to Crane about the resin/glass formulation for Aero-lite. In effect, Defendant could not have passed the formula or comparable technical information to Crane for the simple reason that, as noted previously, Plaintiff shielded such information from Defendant.

contract claim. While it makes clear that an injured party need not prove irreparable harm, or a particular amount of monetary damages, to obtain *injunctive relief*, it says nothing about eliminating proof of causation to obtain monetary damages. The only law cited by Plaintiff (in a footnote) to support this argument are cases and a code provision that provide for "nominal damages" when a party is unable to show any actual damage inflicted upon him. But nominal damages are a "token or trifling sum" such as "a few cents or a dollar." *Avina v. Spurlock*, 105 Cal.Rptr. 198, 200 (Cal. Ct. App. 1972). That is a far cry from the hundreds of thousands of dollars Plaintiff seeks here for the alleged wrongful disclosures. In order to obtain damages in this case, Plaintiff must prove causation.

Plaintiff asserts that any consideration of damages as a ground for summary judgment is premature because United States Magistrate Judge Robert S. Ballou "stayed discovery of Azdel's damages as measured by the profits C&D earned in connection with the purchase and resale of CAB" until after a ruling on Defendant's liability for wrongful disclosure. But Defendant is not seeking summary judgment on the ground that Plaintiff has not proven the amount of its lost profits. It is seeking summary judgment on the ground that Plaintiff has not proved, or even attempted to prove, that the alleged disclosures "resulted in" or "caused" Plaintiff any harm. In other words, the question is whether the alleged disclosures caused Plaiintiff to lose any Aero-lite sales the company might otherwise have had, or whether the disclosures caused Plaintiff any other type of harm. Causation is an essential element of proof of liability in a breach of contract case, and it is an element that must be proven before the measure or amount of damages in any amount can even be addressed.

Plaintiff asserts that it has "ample evidence" of injury and damage from Defendant's alleged breaches of confidentiality. However, a review of this section of Plaintiff's opposition does not

show any discussion of Plaintiff's loss of profits, which is the traditional measure of damages for breach of contract. *See, e.g., SSS Enterprises, Inc. v. Nova Petrol. Suppliers, LLC*, 2012 WL 3866490, *7 (E.D. Va. Aug. 30, 2012), *aff'd*, 533 Fed. App'x 321 (4th Cir. Jul. 19, 2013); *Isle of Wight Co. v. Nogiac*, 281 Va. 140, 148 (2011); *Trident Enterprises, Ltd. v. Airtronic USA, Inc.*, 2011 WL 2160953, *4 (E.D. Va. May 31, 2011) (citing *Roanoke Hospital Ass'n & Russell, Inc.*, 215 Va. 796 (1975)); *see also*, Restatement (2d) Contracts, § 343. Instead, Plaintiff reiterates in summary fashion Defendant's alleged disclosures of confidential information, and then Plaintiff states generally that its injury is Defendant's "creation of a competitor and a competing product for Azdel where none has existed before."

The essence of Plaintiff's argument is that, by obtaining the product Defendant desired from a vendor who, unlike Plaintiff, was able to successfully produce commercial quantities of a thermoplastic composite sheet suitable for Defendant's intended purposes, Defendant assisted that successful vendor, and Plaintiff need not show causation of any economic loss. Such a vague complaint about the existence of competition in the marketplace does not demonstrate causation, especially given that Plaintiff proved incapable of producing more than 8 sheets of the lightweight 1,320 gsm product that Defendant sought. (And, Plaintiff refused to produce a sufficient quantity when asked to do so.) Competition is not prohibited by either the MOU or the NDA. Although Plaintiff offered Defendant exclusivity of supply for certain programs under sections 2 and 3 of the MOU, the terms of the MOU do not contain any obligation on the part of Defendant to deal exclusively with Plaintiff. Indeed, as defined in Section 1 of the MOU, the term "Exclusivity" "means AZDEL will not sell or make an offer to sell the Product to anyone other than C&D for applications described in Sections 2 and 3 of this MOU." The MOU did not preclude Defendant from going elsewhere in search of another thermoplastic composite sheet product suitable for use

as interior aircraft sidewalls, and paragraph 12 of the NDA specifically states that Defendant "shall continue to be free to engage in activities of a similar nature with others and to furnish information, other than the disclosing Party's Confidential Information, to and receive information from others regarding the areas to which this Agreement pertains."

Finally, citing *Ajaxo Inc. v. E \*Trade Group, Inc.*, 135 Cal. App. 4th 21, 54-59 (2005), Plaintiff maintains that it may recover development costs and restitution in other forms of relief, including Defendant's profits on the sale of the competing product, through a disgorgement mechanism. However, restitution is effectively an action for unjust enrichment based upon an implied contract, and it is not ordinarily be awarded where, as here, an enforceable binding agreement defining the rights of the parties exists. *See*, *e.g.*, *Paracor Fin., Inc. v. G.E. Capital Corp.*, 96 F.3d 1151, 1167 (9th Cir. 1996); *In re Bank of New York Mellon Corp. False Claims Act Foreign Exchange Lit. v. The Bank of New York Mellon Corp.*, 851 F. Supp. 2d 1190, 1202 (N.D. Cal. 2012); *McBride v. Boughton*, 123 Cal. App. 4th 379, 387-88 (2004). The only exceptions are when the existing contract was procured by fraud or is unenforceable or ineffective for some other reason. *See*, *e.g.*, *McBride v. Boughton*, *supra*. It is clear that Plaintiff cannot recover both its own development costs, which would put Plaintiff in the position it would have been in if the parties had never embarked upon the development of Aero-lite, and Defendant's profits from the sale of CAB, which compensate for amounts Plaintiff would have earned if it had been able to successfully make the product and Defendant had never gone to Crane. *See Ajaxo Inc.*, 135 Cal. App. 4th at 56; *Sperry Rand Corp. v. A-T-O, Inc.*, 447 F.2d 1387, 1393 (4th Cir. 1971). Nor can it get its development costs when it is still capable of manufacturing and profiting from Aero-lite. *Oracle Corp. v. SAP AG*, 734 F. Supp. 956, 969-970 (N.D. Cal. 2010). In short, the cases cited do not allow Plaintiff to just sit back and rake in whatever profits Defendant earns through its own efforts, without proving

some type of injury or damage to Plaintiff which is linked to and caused by Defendant's alleged wrongdoing.

In any event, it is not necessary to determine the proper measure of relief, *i.e.*, damages (Plaintiff's alleged lost profits) or restitution (Defendant's alleged earned profits), in order to find on summary judgment that Plaintiff has not established a breach of contract based upon wrongful disclosure, any more than it is necessary to determine the exact dollar amount of damages incurred. To the contrary, whether Plaintiff needs to prove its own lost profits or Defendant's earned profits is part of the damage inquiry that has been bifurcated. The lack of proof of lost profits matters only because such lost profits are the most common type of evidence of causation, of which Plaintiff has produced none.

## IV. PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff argues that summary judgment should be granted in its favor on the liability aspects of its claims, and that it should be permitted to conduct discovery on its claims for damages, which have been stayed. However, as discussed above, the undisputed facts leave me with matters of contract interpretation that I must decide against Plaintiff. Plaintiff was not capable of producing the quality product that Defendant obligated itself to purchase under the terms of the MOU. The warped 2,000 gsm Aero-lite sheets delivered to Defendant were nonconforming and unacceptable to Defendant and its airline customer. The 1,320 gsm weight sheets were not delivered in the agreed-upon quantity on a per lot basis. And finally, Plaintiff has not produced any evidence that Defendant breached any obligation of confidentiality to Plaintiff in connection with Defendant's more recent contractual relations with Crane.

## V. CONCLUSION

For these reasons, Defendant's motion for summary judgment will be granted and Plaintiff's

motion for partial summary judgment will be denied.  This disposition of the motions moots Plaintiff's request for additional discovery on its damages claims in Count IV and V.  Accordingly, the complaint will be dismissed and any other pending motions will be denied as moot.

An appropriate order accompanies this memorandum opinion.

Entered this ____2nd____ day of June, 2014.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE